UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| SCOTT A. MEYER, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | CAUSE NO. 1:15-cv-00013-SLC |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Scott A. Meyer appeals to the Court from a final decision of the Commissioner of Social Security denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (DE 1). For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED for further proceedings in accordance with this Opinion and Order.

## I. PROCEDURAL HISTORY

Meyer applied for DIB in July 2011, alleging disability as of August 15, 2005. (DE 13 Administrative Record ("AR") 29, 185-86). The Commissioner denied Meyer's application initially and upon reconsideration, and Meyer requested an administrative hearing. (AR 115-37). On September 6, 2012, a hearing was conducted by Administrative Law Judge Maryanne Bright ("the ALJ"), at which Meyer, who was represented by counsel at the time; Meyer's wife; and a vocational expert ("VE") testified. (AR 47-105).

On October 25, 2012, the ALJ rendered an unfavorable decision to Meyer, concluding

---

[1] All parties have consented to the Magistrate Judge. (DE 16); *see* 28 U.S.C. § 636(c).

that he was not disabled because despite the limitations caused by his impairments, he could perform some of his past relevant work, as well as a significant number of other light work jobs in the economy. (AR 37).

The Appeals Council granted Meyer's request for review of the ALJ's decision and issued its decision on May 3, 2014. (AR 4-8). The Appeals Council noted that Meyer had previously filed an application for DIB on April 15, 2008, alleging an onset date of July 2, 2005. (AR 4). An ALJ had issued Meyer an unfavorable decision on that prior application on September 17, 2008, and Meyer did not appeal that decision. (AR 4). The Appeals Council therefore found that the doctrine of *res judicata* applied through September 17, 2008, *see* 20 C.F.R. § 404.957(c)(1), and thus, that the ALJ should not have adjudicated that time period in the present decision. (AR 4-5). Accordingly, it dismissed Meyer's request for review of the period from August 15, 2005, through September 17, 2008. (AR 4-5).

The Appeals Council further found that Meyer's date last insured was June 30, 2011, not December 31, 2010, and that the ALJ did not adjudicate the time period between January 1, 2011, and June 30, 2011. (AR 5). Nonetheless, the Appeals Council found that the ALJ had sufficiently addressed all of the medical evidence of record, including the evidence dated between January 1, 2011, and June 30, 2011. (AR 5). Accordingly, the Appeals Council adopted the ALJ's findings, except that it corrected Meyer's date last insured to June 30, 2011. (AR 5-8). The Appeals Council's decision became the Commissioner's final decision for purposes of judicial review. *See* 20 C.F.R. § 404.981.

On January 14, 2015, Meyer filed a complaint with this Court, seeking relief from the Commissioner's final decision. (DE 1). Meyer advances two arguments in this appeal: (1) that

the residual functional capacity ("RFC") assessment assigned by the ALJ is not supported by substantial evidence because the ALJ failed to account for limitations caused by his migraine headaches; and (2) that the ALJ improperly discounted the credibility of his symptom testimony. (DE 17 at 6-11).

## II. FACTUAL BACKGROUND[2]

### A. Background

At the time of the ALJ's decision, Meyer was 53 years old (AR 39, 51); had a high school education and one year of college (AR 54); and had past work experience in the manufacturing industry, as a parts manager in the agricultural industry, and as a service technician in the home construction industry (AR 369). At the time of the hearing, Meyer was working part-time as a delivery driver for an auto dealership and, on a self-employed part-time basis, was refinishing furniture. (AR 54-55, 85). In his application, Meyer alleged disability due to migraine headaches, neck pain, nausea, lower back pain, sciatica, hearing loss, and loss of balance. (AR 368).

### B. Meyer's Testimony at the Hearing

At the hearing, Meyer testified that he lives with his wife, who is employed, and two children, ages 21 and 19. (AR 52-53). He performs some household chores, such as grocery shopping, lawn mowing, caring for their pets, and taking out the trash. (AR 79-81). He was working part-time so that he could "work[] around his bad days." (AR 53, 55). He refinishes furniture up to four hours a day, taking breaks every hour, and displays the furniture at an antique mall. (AR 78-79, 94-95). He also works part-time for an auto dealership, driving up to

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 684-page administrative record necessary to the decision.

four hours a day, two or three days a week; when driving, he takes a break every 30 minutes to "move around." (AR 85-88). About two or three times a month, he has to decline a trip for the dealership due to headaches or pain. (AR 88). As his headaches and pain permit, on Mondays, Wednesdays, and Fridays he drives for the dealership, and on Tuesdays and Thursdays he works for himself refinishing furniture. (AR 90).

When asked why he thought he could not work full-time, he responded that the number of days he has headaches would prevent him from holding a job, as his migraines occur three to four times a week. (AR 61, 93). He stated that medication helps to relieve his headaches, but makes him drowsy, causing him to feel worse after he takes it; he then sleeps for two hours after taking the medication. (AR 61-62). His medications include Meloxicam for arthritis, Flexeril as a muscle relaxer, Topamax and Imitrex for headaches, and Tylenol and ibuprofen for pain, as well as two blood pressure medications and a nasal decongestant. (AR 64-65).

Meyer also complained of intermittent, chronic neck pain that radiates to his head, which started after an auto accident in 1999. (AR 59, 62, 67, 72). He described his neck pain as an "ache," which could be aggravated by activity. (AR 72-73). He had received some neck injections, which were not effective, and had participated in physical therapy. (AR 66-67). He stated that the medicines, "stretch[ing] out," and taking up to a 30-minute break all help to relieve his neck pain. (AR 73, 82). He also complained of some occasional back pain, but emphasized that it was "not chronic like the neck." (AR 68).

As to his physical limitations, Meyer estimated that he could sit for 15 minutes at a time on a hard chair, but longer in a recliner. (AR 73-74). He thought he could stand for an hour at a time, and he walks every other day for exercise. (AR 75). He feels that he has arthritis in his

4

hands, which sometimes makes upper extremity activity more difficult. (AR 76-77). Certain postural positions sometimes bother his back. (AR 77).

Meyer also reported that he was taking medication for depression, but he had not received any other mental health treatment. (AR 68-69). For about nine months in 2005 or 2006, he talked with lay counselors at his church on a weekly basis. (AR 69). About a year ago, Meyer went through training to become a lay counselor, and he now counsels others in his church for an hour every other week. (AR 70-71).

When asked why he did not receive any medical care from May 2010 to August 2011, Meyer cited his financial condition and stated that he did not have health insurance at the time. (AR 63). By the time of the hearing, he again had health insurance.[3] (AR 91-92).

## C. *Summary of the Medical Evidence*

In 1999, Meyer was in an auto accident. (AR 381, 485, 515). After the accident, he began to experience neck pain, dizziness, balance issues, and headaches. (AR 485).

An MRI of Meyer's cervical spine in August 2005 revealed mild degenerative disc changes at the C5-C6 level, but was otherwise unremarkable. (AR 484, 516). An MRI of his lumbar spine in 2006 showed degenerative disc disease in the lower lumbar spine and disc bulges at L4-L5 and L5-S1. (AR 511, 513). He received epidural steroid injections in his lumbar spine, cervical spine, and scapula; a greater occipital nerve block; and physical therapy, but these treatments did not provide lasting relief from his neck, back, and lower leg pain. (AR 488, 494, 497, 506). Medications have been more helpful in reducing his symptoms. (AR 477,

---

[3] Meyer's wife also testified at the hearing, essentially corroborating his testimony. (AR 96-97). She estimated that he has about three bad days a week. (AR 96).

610, 616, 621, 626, 659).

In July 2007, Meyer saw Dr. Lawrence Wuest, his primary care physician. (AR 618). Because he was without health insurance at the time, the only medicine that Meyer was routinely taking was Diovan. (AR 618). He took Flexeril occasionally for his low back pain. (AR 618). He had been off of Topamax, and his headaches had increased. (AR 618). Dr. Wuest gave Meyer some samples of Maxalt for his headaches and Lyrica for anxiety, which was stable at the time. (AR 618). Dr. Wuest stressed to Meyer to increase his exercise to at least 30 minutes daily. (AR 618).

In August 2008, Wayne Von Bargen, Ph.D., performed a mental status examination at the request of the state agency. (AR 576-79). Dr. Bargen thought that the presence of a pain disorder was likely. (AR 577). He noted that Meyer admitted irritability and frustration, which he thought probably reflected the presence of mild depression consistent with a dysthymic disorder. (AR 577). Dr. Bargen's diagnostic impression was a pain disorder and a dysthymic disorder; he assigned Meyer a Global Assessment of Functioning ("GAF") score of 55.[4] (AR 578).

That same month, William Shipley, Ph.D., a state agency psychologist, reviewed Meyer's record and completed a psychiatric review technique form. (AR 580-93). On the form, Dr. Shipley found that Meyer had no restrictions in daily living activities and just mild difficulties in

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*
   "The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, Dr. Von Bargen used a GAF score in assessing Meyer, so it is relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

maintaining social functioning and in maintaining concentration, persistence, or pace. (AR 590). In his narrative, Dr. Shipley wrote that Meyer's functional limitations were more related to his physical condition than any mental impairment, which was nonsevere. (AR 592).

Also in August 2008, Dr. Kinzi Stevenson examined Meyer at the request of the state agency. (AR 595-98). Meyer complained of low back and neck pain with lifting and bending, difficulty with balance, right-sided hearing loss, and migraine headaches, but emphasized that his headaches, which were occurring four to five times per week, were his predominant disability. (AR 595). Meyer reported that he could stand for 20 minutes at a time and a total of six hours in an eight-hour day, sit for 20 minutes at a time, lift 40 pounds, drive a car for four hours, and perform all household chores, except that he must mow the lawn in shorter intervals. (AR 595). A physical examination was normal except for reduced lumbar range of motion and very mildly reduced cervical range of motion; Meyer demonstrated a normal gait and full strength, could squat to the ground, and had no tenderness in his low back or neck. (AR 596). Dr. Stevenson noted that a cervical MRI dated August 2005 demonstrated mild degenerative changes at C5-6 level. (AR 597-98). Dr. Stevenson could not appreciate any limitations in sitting, walking, seeing, hearing, or speaking, and estimated that Meyer could lift 20 pounds more than two-thirds of the day. (AR 598).

In September 2008, Dr. J. Sands, a state agency physician, reviewed Meyer's record and completed a physical RFC assessment. (AR 600-07). He concluded that Meyer could lift 10 pounds frequently and 20 pounds occasionally; stand or walk six hours in an eight-hour workday; sit six hours in and eight-hour workday; occasionally climb, balance, stoop, kneel, crouch, and crawl; but must avoid concentrated exposure to vibration and hazards. (AR 601-04).

7

In April 2009, Meyer saw Dr. Wuest for the first time since July 2007, complaining of low back pain with tingling in his lower extremities. (AR 616). Dr. Wuest noted that Meyer used to have migraines on a daily basis, but since taking Topamax, they occurred, at most, three times a week; Meyer expressed that Maxalt had helped as well, but that he wanted to try Trexima. (AR 616). Dr. Wuest prescribed Flexeril ointment and Trexima, increased the Topamax, and referred Meyer to an orthopedist. (AR 616). In May, Dr. Wuest noted that Meyer's blood pressure was elevated, and he instructed Meyer to work hard on dieting and exercise. (AR 612). He refilled Meyer's medications, noting that one of the medications was helpful but tended to "knock him out"; he also restarted Meyer on Lexapro. (AR 612).

In June 2009, Meyer's main complaints to Dr. Wuest were headaches and neck pain. (AR 610). Meyer was taking four extra-strength Tylenol at a time, but stated the Tylenol was not helping. (AR 610). Dr. Wuest cautioned Meyer to take his medications as prescribed, as taking more Tylenol than recommended could cause liver damage. (AR 610). Meyer reported that Imitrex did help, and Dr. Wuest told him he should be taking it more often; Meyer responded that he was afraid he would then be taking it three to four times a week. (AR 610). Dr. Wuest reassured Meyer that the neurologists felt his brain MRI findings were consistent with migraines and that the Topamax and Imitrex was a good combination to work with. (AR 610). Again, Dr. Wuest wrote that, with Topamax, Meyer's headaches were "much better" in that they had reduced from "constant" to three or four times per week. (AR 610).

In May 2010, Meyer returned to Dr. Wuest after not seeing him for almost a year; Meyer was out of his medications and had insurance problems. (AR 609). He reported more

8

headaches, but mainly because he was not taking Topamax; he was also not doing anything for his diet or exercise. (AR 609). Dr. Wuest refilled his medications and re-emphasized the importance of diet and exercise. (AR 609).

In August 2011, Jack Clark, a chiropractor, completed a medical source evaluation, opining that Meyer could sit for two hours at a time and eight hours total; stand for one hour at a time and six hours total; walk for one hour at a time and five hours total; lift or carry 10 pounds frequently and 50 pounds occasionally; occasionally crawl, squat, or climb; and frequently bend or reach. (AR 635-36). He stated that he had not seen Meyer since October 2009 and that his report was based on two-year-old records. (AR 636).

In September 2011, Dr. Shipley again reviewed Meyer's record and concluded that it contained insufficient medical evidence to establish a severe mental impairment for the period of August 15, 2005, through December 31, 2010. (AR 637). A second state agency psychologist, Joelle Larsen, Ph.D., later affirmed this opinion. (AR 663).

Also in September 2011, Dr. Joseph Gaddy, a state agency physician, reviewed Meyer's record and concluded that it contained insufficient information to establish a severe impairment as of December 31, 2010. (AR 651). A second state agency physician, Dr. J. Eskonen, later affirmed this opinion. (AR 664).

In August 2011, Meyer saw Dr. Austin Schlie for a follow up on his hypertension, but his chief complaint was migraine headaches. (AR 655, 659). He was experiencing weekly headaches, despite his medication, with each episode lasting for hours. (AR 655). His headaches occurred during the day and were aggravated by bright light, noise, and stress, and were relieved by medication and rest in a dark, quiet room. (AR 655). Dr. Schlie continued the

9

Topamax and Imitrex and added Flexeril to be taken at the onset of a headache. (AR 656-57).

In December 2011, Meyer returned to Dr. Schlie again primarily complaining of headaches, rating his pain as a "six" on a scale of one to ten. (AR 672). He stated that each headache lasted several hours. (AR 672). Dr. Schlie noted that Meyer had a significant emotional or psychological component to his pain, and thus, Dr. Schlie started him on Amitriptyline to see if the frequency of his headaches would decrease, in addition to Mobic. (AR 673-74). In March 2012, Meyer reported that he had recently been waking with headaches. (AR 669). Dr. Schlie indicated that sinus problems and possible sleep apnea might be contributing to Meyer's complaint of waking headaches. (AR 669-71). He continued Meyer's medications. (AR 671).

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not "reweigh the evidence, resolve conflicts, decide questions of credibility," or

substitute its judgment for the Commissioner's. *Id.* (citations omitted). Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer

---

[5] Before performing steps four and five, the Commissioner must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

11

leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The Commissioner's Final Decision

On May 3, 2014, the Appeals Council issued the Commissioner's final decision, adopting most of the ALJ's findings. (AR 4-8). At step one, the Commissioner found that although Meyer had worked part-time after his alleged onset date, he had not engaged in substantial gainful activity from his alleged onset date through his date last insured, June 30, 2011. (AR 7). At step two, the Commissioner concluded that Meyer had severe impairments of lumbar degenerative disc disease, degenerative changes in the cervical spine, headaches, and obesity. (AR 7). At step three, the Commissioner determined that Meyer's impairment or combination of impairments were not severe enough to meet a listing. (AR 7). Before proceeding to step four, the Commissioner found that Meyer's subjective complaints were "not fully credible" and assigned him the following RFC as of his date last insured:

> [T]he claimant has the [RFC] to perform light work . . . except that he was only occasionally able to climb, balance, stoop, kneel, crouch, and crawl; he needed to avoid concentrated exposure to excessive vibration; and he was able to use his hands for repetitive actions and use his feet for repetitive movements, such as operation of foot controls.

(AR 7).

At step four, the Commissioner concluded that Meyer was able to perform his past relevant work as a customer service representative. (AR 7). Alternatively, the Commissioner

found at step five that there were a significant number of light exertional level jobs in the national economy that Meyer could have performed through his date last insured. (AR 7). Therefore, Meyer's claim for DIB was denied. (AR 7).

*C. The Assigned RFC Does Not Adequately Account for Meyer's Migraine Headaches*

Meyer argues that when assigning his RFC, the ALJ failed to adequately account for his migraine headaches, which the ALJ found to be a severe impairment. Meyer's argument is persuasive, as the ALJ failed to explain how Meyer could perform full-time work despite the frequency of his migraine headaches.

The RFC is a determination of the tasks a claimant can do despite his limitations. *See* 20 C.F.R. § 404.1545(a)(1). The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. § 404.1545. When assigning an RFC, an ALJ must consider the combined effect of a claimant's severe and non-severe impairments. *See Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005); *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004); *Clifford*, 227 F.3d at 873; *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000); 20 C.F.R. § 404.1523.

When assigning the RFC, the ALJ explained that she considered the objective medical evidence, Meyer's activities of daily living, and the medical source opinions, together with other evidence of record. The Court will address these areas in turn.

Before discussing the objective medical evidence, the ALJ acknowledged that Meyer complained of various physical and mental problems, including that he suffered from disabling headaches three or four times per week. (AR 37). The ALJ then penned two lengthy paragraphs discussing the objective medical evidence. The ALJ first observed that the physical examinations showed findings largely within normal limits, except for intermittent hypertension and decreased range of motion, crepitus, and tenderness of his neck. (AR 37). As such, the ALJ discounted Meyer's complaints of neck pain, back pain, and difficulty using his hands, stating that there was no reason to conclude that Meyer was limited in his ability to sit, stand, walk, reach, or perform upper extremity manipulative activities. (AR 37). The ALJ also discounted Meyer's claim of problems with balance and dizziness by noting that Meyer had successfully completed a vestibular rehabilitation program in 2005 and admitted that he rides a bike. (AR 37). The ALJ further rejected Meyer's claim of vision and hearing problems, observing that test results in those areas were essentially within normal limits. (AR 37).

In these two paragraphs on the objective medical evidence, however, the ALJ did not address the evidence from Dr. Wuest, Meyer's treating physician, concerning Meyer's migraine headaches. (*See* AR 37). Most significantly, in May 2009, Dr. Wuest wrote that Meyer used to have migraines on a daily basis, but since taking Topamax, he had them, at most, three times a week. (AR 612). In June 2009, Dr. Wuest encouraged Meyer to take Imitrex more often; Meyer acknowledged that Imitrex was helpful, but he was concerned that he would be taking it three to four times a week due to the frequency of his migraines. (AR 610). Dr. Wuest then reassured Meyer that the neurologists viewed the findings from his brain MRI consistent with migraines, and that the Topamax and Imitrex were a good combination to work with. (AR 610). At this

14

visit, Dr. Wuest reiterated that Meyer's constant headaches had reduced to three or four times per week with Topamax. (AR 610). In May 2010, Dr. Wuest wrote that Meyer had been having more headaches again, but mainly because he was not taking the Topamax due to his insurance problems. (AR 609).

The ALJ, thus, did not address the medical evidence from Dr. Wuest reflecting that, *even with medication*, Meyer's migraine headaches were occurring three to four times per week. "While the ALJ need not comment on every piece of evidence in the record, she cannot ignore important evidence that directly contradicts one of her findings." *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1047-48 (E.D. Wis. 2005) (collecting cases).

The ALJ did, however, address Meyer's complaint of medication side effects. In that regard, Meyer stated that his medication was helpful in reducing the intensity of his headaches, but that after taking the medication—in particular, Imitrex and Flexeril—he temporarily feels worse and needs to lie down and sleep for two hours, further reducing his functional ability. (AR 65 ("That's the one I don't like to take too often, because I feel worse after I take it.")). The ALJ rejected Meyer's testimony of significant side effects, stating that "the degree of difficulty is not confirmed in the medical evidence of record." (AR 37). But the ALJ again overlooked Dr. Wuest's medical evidence, as Dr. Wuest wrote in May 2009 that although Meyer's medications did help with his headaches, at least one medication "tends to knock him out." (AR 612). This evidence supports Meyer's contention that he has difficulty with medication side effects. *See Plump v. Colvin*, No. 1:13-cv-1446-DKL-SEB, 2015 WL 1143111, at \*7 (S.D. Ind. Mar. 12, 2015) (remanding the ALJ's decision where the ALJ failed to confront the evidence of limitations resulting from the claimant's migraine headaches, which occurred three times a week,

and explain why that evidence was rejected).

The ALJ also considered Meyer's daily activities when assessing his RFC, articulating that they do not support a more restrictive RFC assessment than that assigned. (AR 36). In doing so, the ALJ cited Meyer's part-time work, church activities, shopping, gardening, household duties, and time spent with his children. (AR 36). But the ALJ fails to explain how these activities—which all have flexibility in scheduling—are inconsistent with the evidence of migraine headaches that occur three to four times a week. "[T]he critical difference between daily living activities and activities of a full-time job is that in the former the person has more flexibility in scheduling, can get help from others when needed, and is not held to a minimum standard of performance." *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014) (citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (observing a long-standing problem in that ALJs have "equated the ability to engage in some activities with an ability to work full-time, without a recognition that full-time work does not allow for the flexibility to work around periods of incapacitation" (citations omitted)).

With respect to his part-time work, Meyer testified that he refinished furniture on his own schedule, and his part-time car delivery job flexed around his bad days. (AR 55, 88). However, in concluding that Meyer could perform his past relevant work as a customer service representative, there was no suggestion that such work was generally performed in the national economy with any type of flexible schedule. (AR 6, 37, 98-103); *see Moore*, 743 F.3d at 1126 ("Absent a showing that [the claimant] ha[d] a completely flexible work schedule in her past position as a reservation agent, the existence of symptom-free days adds nothing here."). Nor was there any suggestion that the alternative representative jobs cited at step five could be

16

performed on a flexible schedule. (AR 6, 38, 98-103). The frequency of Meyer's headaches is a material issue because the VE testified that employers consider absenteeism greater than two days a month to be "excessive and unemployable in any work situation." (AR 101).

The ALJ also cited the medical source opinions of record when assigning Meyer's RFC, relying primarily on those from Dr. Sands, a state agency physician who reviewed Meyer's record in September 2008, and Dr. Stevenson, a consulting physician who examined Meyer in August 2008. It is true that neither Dr. Sands nor Dr. Stevenson assigned specific limitations based on Meyer's headaches. Dr. Sands simply stated: "Clmt notes migraines, no rx drugs, no er visits." (AR 601). But there is no indication that Dr. Sands considered Meyer's lack of insurance to obtain prescription medications and medical care at the time.

As to Dr. Stevenson, he acknowledged that Meyer felt "his predominant disability is his recurrent headaches" and that he had "four to five headaches per week"; however, Dr. Stevenson did not address this condition at all when discussing Meyer's limitations. (AR 595). Because these two doctors did not specify how Meyer's migraines relate to the RFC that they penned, the Court is not confident that these opinions relieved the ALJ of any further obligation to account for the migraines when assigning Meyer's actual RFC. Thus, these doctors' opinions "cannot provide the needed logical bridge." *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) ("Dr. Kim did not actually specify how Moon's migraines relate to the [RFC] she found. She did not address the possibility that a migraine could keep Moon at home in bed, apparently understanding Moon's 'history of frequent migraines' to have implications only for her ability to lift, stoop, and stand.").

Of course, the ALJ found Meyer's subjective complaints "not fully credible" for several

17

reasons, including those described above and for failing to seek free or low-cost healthcare during the rather large gaps in treatment that he experienced when he was without health insurance. (AR 35-36). But even if Meyer's complaints of migraine headaches three to four times per week were not fully credible, that implies that his complaints were, at least, partially credible. Yet, in assigning the RFC and posing the hypotheticals to the VE, the ALJ did not address his headaches—an impairment which the ALJ acknowledged was severe. (AR 32, 35). To reiterate, according to the VE's testimony, Meyer could miss, at most, just one or two days a month for migraines and still maintain competitive full-time employment. *See Muehlenkamp v. Colvin*, No. 14-cv-449wmc, 2015 WL 5093336, at *2 (W.D. Wis. Aug. 28, 2015) (remanding the ALJ's decision due to inconsistency between the ALJ's finding that the claimant's migraines were a severe impairment and the lack of any accommodation for them in the RFC).

In sum, although the ALJ acknowledged that Meyer's migraine headaches were a severe impairment, the ALJ failed to discuss and address any limitations arising from this impairment when assigning Meyer's RFC. Dr. Wuest's treatment notes support that Meyer, even when taking his medications, experienced migraine headaches three or four times a week, and these records are not directly contradicted by other medical evidence about the frequency of Meyer's headaches. As such, the Commissioner's final decision will be remanded for reconsideration of the RFC and the evidence pertaining to Meyer's migraine headaches.[6] *See Moore*, 743 F.3d at 1126 (finding that the ALJ erred when concluding that incapacitating migraines once or twice a week would not be problematic because the claimant would still have most of the week without

---

[6] Because a remand is warranted based on the arguments addressed herein, the Court need not reach Meyer's remaining arguments.

such symptoms, stating that such flawed reasoning "essentially ignores the inability to schedule the incapacitating migraines").

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.  The Clerk is directed to enter a judgment in favor of Meyer and against the Commissioner.

SO ORDERED.

Enter for this 2nd day of December 2015.

/s/ Susan Collins  
Susan Collins  
United States Magistrate Judge